IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



EOD
09/29/2006

| | |
|---|---|
| IN RE: § | |
| § | |
| HAROLD HUBER and YOLINDA § | Case No. 04-45645 |
| HUBER, § | (Chapter 7) |
| § | |
| Debtors. § | |
| § | |
| § | |
| UNITED STATES TRUSTEE, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Adv. No. 05-4054 |
| § | |
| HAROLD HUBER and YOLINDA § | |
| HUBER, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION[1]

This matter is before the Court following trial of the Complaint Objecting to Discharges (the "Complaint") filed by the United States Trustee ("Plaintiff" or "U.S. Trustee"). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 151 as well as the standing order of reference in this district. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

The U.S. Trustee's Complaint seeks an order from this Court denying the discharge of Harold and Yolinda Huber (collectively, the "Debtors") pursuant to 11

---

[1] This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

U.S.C. §727(a)(2)(A) based on their use of unsecured credit to complete construction of their home and pay virtually all of their personal expenses in the year prior to bankruptcy. After the trial on April 27, 2006, the Court set the matter for a later ruling. For the reasons given below, the Court finds that the Debtors' discharge should be denied pursuant to §727(a)(2)(A).

## BACKGROUND FACTS

The Debtors filed a joint, voluntary petition for relief under Chapter 7 of the Bankruptcy Code on December 3, 2004. In their bankruptcy schedules, which the Debtors filed with their petition, the Debtors claimed assets valued at $218,525. Of that amount, the Debtors' home at 111 Sante Fe Trail in Whitewright, Texas, which is located on 82.4 acres, was valued at $200,000.

According to their schedules, the Debtors had no secured debt, no unsecured priority debt, and $227,452.18 in unsecured non-priority debt at the time they filed for bankruptcy. Nearly all of the Debtors' unsecured debt was owed on credit cards and unsecured lines of credit from various financial institutions. The Debtors had no cash on hand when they filed their bankruptcy petition.

The Debtors designated their home and the property on which it sits as their exempt homestead in their bankruptcy schedules. No party made any objection to the exemption. Additionally, none of the Debtors' unsecured creditors objected to the discharge of the Debtors' obligations to them pursuant to 11 U.S.C. §523(a).

In the Complaint, the U.S. Trustee does not challenge the Debtors' exemption of their homestead. Rather, the U.S. Trustee objects to the Debtors' discharge in bankruptcy based on their use of unsecured credit to build their home, among other things. The

Debtors opposed the Complaint, arguing that (1) most of the transfers the U.S. Trustee is challenging occurred more than one year prior to bankruptcy, and (2) the Debtors lacked the requisite intent

## **The Debtors Purchase 82.4 Acres of Real Estate**

Mr. Huber graduated from Brigham Young University in 1975 with a Bachelor of Science degree. From 1972 to 1985, Mr. Huber worked in the construction industry as, among other things, a general contractor and carpenter. From 1985 through November 1, 2002, he was employed by Electronic Data Systems ("EDS") as a web engineer, where his gross salary for 2002 was approximately $95,000.

In or around 1999, the Debtors became interested in building a monolithic "dome home." Mr. Huber completed a 5-day course on monolithic "dome home" construction in 1999. Mr. Huber testified that he knew it would be difficult to obtain conventional financing to build the home, so he and his wife decided to construct the home using credit cards and unsecured lines of credit. Mr. Huber testified that he got the idea to use unsecured credit to build a "dome home" from a web article written by a "dome home" builder in Michigan.[2] Mr. Huber also testified that he decided not to use conventional financing for the construction his home because the process of obtaining financing was "arduous" and a "hassle."

The Debtors accumulated approximately $300,000 in unsecured credit by obtaining credit card accounts and lines of credit from various financial institutions. They used draws on the lines of credit and credit cards to purchase 82.4 acres in

---

[2] It is noteworthy that Texas, historically, has limited the types of debts that can be secured by the homestead. Section 50(a) of article XVI of the Texas Constitution sets forth the types of loans or extensions of credit that may be secured by a borrower's homestead. For example, subsection (a)(1) allows a lien that secures purchase money, and subsection (a)(4) allows a lien that secures the refinance of an existing lien against a homestead. Any lien on a homestead other than the permitted types is invalid.

Whitewright, Texas, for $106,600 on May 22, 2002. Mr. Huber testified that he decided not to use conventional financing to purchase the real estate because several friends had expressed an interest in buying portions of the property. Mr. Huber testified that they planned to satisfy their unsecured obligations by selling parts of the property acres to their friends. However, according to Mr. Huber, their friends backed out of the deal after the Debtors purchased the property. As of the time of trial, the Debtor had not publicly marketed any portion of the 82.4 acres.

Mr. Huber testified that in June 2002, he used a mortgage broker in Dallas to apply for a construction loan for the "dome home" he planned to build. The lender, however, was unwilling to provide a loan due to the unusual nature of the construction. The Debtors, who at that time owed approximately $130,000 on their credit cards and unsecured lines of credit, went ahead with their plan to use more draws on their credit cards as well as the equity in their existing home build a "dome home."

In October 2002, the debtors refinanced their existing home in Plano, Texas. The Debtors received approximately $25-30,000 of the proceeds as their equity.

## Mr. Huber Is Laid Off

Mr. Huber was laid off from EDS on November 1, 2002. He had no advance warning of the layoff and received only a few weeks of severance pay. The Debtors had approximately $5,000 in savings at that time. At that time, Mrs. Huber made less than $2,000 a year. Mrs. Huber has not worked outside the home since June 2003.

After his layoff, Mr. Huber decided to return to the construction business. He completed a small remodeling project in early 2003. His next project was the construction of his "dome home." Mr. Huber testified that they believed it would cost approximately $75-80,000 to build the home if he supplied most or all of the labor.

### The Debtors Construct a "Dome Home"

Beginning in July 2002, the Debtors made several improvements to their property in Whitewright, Texas, including building a bridge and installing a water line. In May 2003, the debtors began constructing the "dome home." For the next thirteen months, Mr. Huber spent approximately 90% of his time building the home.

In June 2003, the Debtors sold their existing home in Plano, Texas. They cleared approximately $12,000 from the sale and used the proceeds for construction and living expenses. The Debtors borrowed a travel trailer from friends and moved onto the 82.4 acres where they were constructing their new home.

From approximately August 2003 through December 2003, the Debtors sold their only remaining hard asset – silver and gold coins given to them by Mrs. Huber's parents. The Debtors received approximately $20,000 from the sale of the precious metal. As with their home equity, the Debtors used these funds to pay monthly credit card bills, construction expenses, and living expenses.

Neither of the Debtors generated any significant income during 2003 or 2004. The debtors' total net income for 2003 was $3,729. The Debtors' total net income for 2004 was $3,882.

### The Funds from the Debtors' Credit Lines "Dry Up"

Before and after commencing the construction of their new home, the Debtors lived off credit cards and lines of credit. They used draws on their lines of credit to pay minimal amounts on their monthly credit card bills. Occasionally, the Debtors used

convenience checks to transfer a balance from one credit card to another.[3]

By March 2004, the Debtors were running out of money. The Debtors once again sought conventional financing on their "dome home" and completed numerous loan applications. On these applications, the Debtors stated that they made $6,000 in income each month. In fact, the $6,000 in "income" reported by the debtors represented the amount the debtors planned to draw each month from their credit cards and lines of credit.

The Debtors received two appraisals of their home in connection with their loan applications. In April 2004, the Debtors' "dome home," the nearby barns and workshop, and the five acres upon which these improvements sit were appraised for $266,000 in connection with one of the Debtors' loan applications. In July 2004, the same appraiser valued the improvements and the surrounding 13.425 acres at $220,000 in connection with a different loan application.

None of the Debtors' loan applications were approved. The Debtors finished construction of their "dome home" in June 2004. In or around June 2004, Debtors purchased appliances, tile and other items for their new home on credit.

In July 2004, Mr Huber registered a business called "Huber Construction" with the Texas Residential Construction Commission. Mr. Huber subsequently obtained several small construction jobs, but he was unable to continue to make even minimal payments on his credit cards and lines of credit. The Debtors ceased using their credit cards after August 2004.

---

[3] Mrs. Huber had at least two credit cards in her own name, and she was a co-applicant on loan applications in March and April 2004, as discussed below. Although it was Mr. Huber who was primarily involved with transferring their debts from one credit card or line of credit to another, Mrs. Huber was aware of the amounts they owed on their credit cards and lines of credit at all relevant times.

**MEMORANDUM OPINION – Page 6**

Approximately two months after completing construction of their home, in August 2004, the Debtors sent a form letter to each of the credit card companies with which they had outstanding unsecured debts. They explained that they had used the credit to purchase 82.4 acres and construct their "dome home." They shared their plan to obtain a mortgage to pay off their credit balances, but stated that none of their applications had been accepted. Mr. Huber shared an alternative plan to pay his creditors by using proceeds from his construction business.

### The Debtors' General Spending Patterns

In their bankruptcy schedules, the Debtors reported monthly income of $2,000 from the operation of Mr. Huber's construction business. The Debtors reported monthly expenses of $1,976. These expenses consisted of the following: $175 for electricity, heating and fuel; $35 for water and sewer; $160 for telephone; $150 for cable; $100 for home maintenance; $400 for food; $25 for clothing; $25 for laundry and dry cleaning; $50 for medical and dental expenses; $200 for transportation (not including car payments); $50 for recreation; $56 for life insurance; $150 for health insurance; and $350 for employment and real estate taxes.

At trial, the U.S. Trustee submitted monthly credit card statements regarding ten accounts used by the Debtors during 2004.[4] These records show that the total amount owed on those accounts increased by approximately $35,000 from December 2003 through December 2004.[5] Furthermore, the documentary evidence presented by the U.S. Trustee shows that the Debtors opened (or began charging on) three new accounts during

---

[4] The Debtors' bankruptcy schedules include additional credit accounts.

[5] Mr. Huber's testimony that he made $32,000 in "payments" during this period was misleading and inaccurate in that the "payments" were either balance transfers or made with funds borrowed from other unsecured creditors.

2004: (1) in March 2004, the Debtors' began using an account with American Express (account no., 3722-818817-52006), which had a balance of $11,897.06 on the petition date according to the Debtors' schedules; in April 2004, the Debtors began using a credit account with Bank of America (account no. 4727-1030-1817-8144), which had a balance of $3825.30[6] as of the petition date according to the Debtors' schedules; in August 2004, the Debtors began using a credit account with Capital One (account no. 5178-0584-5386-1193), which had a balance of $562.32[7] as of the petition date according to the Debtors' schedules.

The Debtors' credit card records also reflect that the Debtors took several trips and vacations during 2003 and 2004. In particular, the Debtors went to Florida in February 2004 to attend a seminar on how to make money in real estate, and they used credit cards to purchase approximately $5,500 of materials at the seminar. In March 2004, the debtors used a credit card to pay the yearly maintenance fee for their time share in Acapulco, Mexico. In April 2004, the Debtors took a road trip to Utah and New Mexico, where they used their credit cards. Some friends flew the Debtors to Hawaii in May 2004, where the Debtors used their credit cards. Additionally, the Debtors' children flew them to Cancun in October 2004, where the Debtors used their credit cards.

## ANALYSIS

In general, § 727 of the Bankruptcy Code provides that the Court must grant a discharge to a Chapter 7 debtor unless one or more of the specific grounds for denial of a

---

[6] The monthly account statements reflect that the credit limit on this account was $3,600 and that the Debtors were charged for exceeding that limit.

[7] The monthly account statements reflect that the credit limit on this account was $500 and that the Debtors were charged for exceeding that limit.

discharge listed in paragraphs (1) through (10) of § 727(a) is proven to exist. The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *See, e.g., Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 U.S. 452 (5th Cir. 1974). Further, under Bankruptcy Rule 4005, the burden of proof is on the party objecting to discharge.

Section 727(a)(2) actions are often brought by individual creditors based on the debtor's conduct as to that creditor. *See, e.g., In re Dennis,* 330 F.3d 696 (5th Cir. 2003) (debtor's ex-husband sought denial of debtor's discharge under § 727 or a determination that debtor's debt to him was nondischargeable under § 523). Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to a creditor (or to creditors, generally) by concealing or otherwise disposing of assets. To sustain an objection under § 727(a)(2)(A), the proof must show:

(1) that the act complained of was done within the one year before the date of the filing of the petition;

(2) that the act was done with actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

(3) that the act was that of the debtor or a duly authorized agent of the debtor;

(4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*See, e.g., Lanston v. Balch (In re Balch)*, 25 B.R. 22 (Bankr. N.D. Tex. 1982). *See also, e.g., In re Reed,* 700 F.2d, 986, 989-990 (5th Cir. 1983) ("While pre-bankruptcy conversion of nonexempt into exempt assets is frequently motivated by the intent to put those assets beyond the reach of creditors, which is, after all, the function of an exemption, evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge.").

**MEMORANDUM OPINION** – Page 9

### Whether the Act(s) Occurred Within One Year of Bankruptcy

In this case, with respect to the first element of § 727(a)(2)(A), the U.S. Trustee established that the Debtors lived their lives on credit in the year prior to bankruptcy. The Debtors opened three new accounts in the year prior to bankruptcy (two of which were over the relevant credit limit as of the petition date), and the Debtors used convenience checks make payments on their existing accounts, to take vacations, and to purchase thousands of dollars worth of materials at a real estate seminar. The U.S. Trustee also established that the Debtors used credit to complete the construction of their home during the first half of the year prior to bankruptcy and that they used draws on certain lines of credit to pay balances on other lines of credit during the year prior to bankruptcy. Additionally, Mr. Huber admitted to using credit cards to buy appliances and construction materials for his home in and around June 2004.

### Whether the Acts Were Done With Actual Intent to Defraud Creditors

With respect to the second element § 727(a)(2)(A), a finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct. This is because a debtor is unlikely to testify that the intent was fraudulent. Thus, a court may look to all the surrounding facts and circumstances, including the debtor's course of conduct. *See, e.g., In re Reed*, 700 F.2d 986 (5th Cir. 1983); *Hubbell Steel Corp. v. Cook (In re Cook)*, 126 B.R. 261, 268 (Bankr. E.D. Tex. 1991).

In this case, the Debtors' build-up of credit in 2002 and their use of that credit to purchase land, build a "dome home" on their property, and pay their living expenses had a clear nexus to their later bankruptcy filing. Their general course of conduct sheds light on their intent during the one-year prior to bankruptcy. The Court finds following facts

are particularly significant to the determination of the Debtors' intent during the critical one year prior to bankruptcy:

- The Debtors have never actively marketed their real property, nor have sold any portion of their property – despite their testimony that it was originally their intent to do so in order to pay off the unsecured loans for the property and for the construction of their home.

- Mr. Huber's construction business has generated no significant income since his lay off, and Mrs. Huber generated little or no income in the years prior to bankruptcy.

- There was no evidence that Mr. Huber has sought gainful employment.

- The credit card records admitted at trial showed that the Debtors were frequently above their credit limits.

- Mr. Huber testified that he was juggling their credit card debts in the year prior to bankruptcy.

- Rather than develop his construction business, Mr. Huber spent most of his time working on his own home until it was finally completed in June 2004.

- The Debtors had no ability to repay their debts except by borrowing more money from another lender, which they also had no ability to repay.

- Although the Debtors knew they had no ability to repay their debts, they continued to use credit cards and lines of credit in the year prior to bankruptcy in order to pay their living expenses and finish construction of their home.

*Compare In re Ettell*, 188 F.3d 1141 (9th Cir. 1999) (upholding bankruptcy court's decision that no fraudulent intent existed where the debtor made purchases on his credit card to remodel his home in hopes that he could refinance the home while he continued to work and even took on a second job in order to improve his financial situation).

At trial, the Debtors argued that the mailing of a form letter to ten unsecured lenders in August 2004 indicates that they were making a good faith attempt to deal with their finances. The Debtors waited until after they had completed their home to send the form letter to their creditors, and the Court does not view this letter as a sincere attempt

by the Debtors to address their financial situation. The Court likewise finds that the Debtors did not sincerely believe that they would be able to repay their debts through obtaining conventional financing after they finished constructing the "dome home." The Debtors had no ability to make monthly payments to a secured lender (except by borrowing more money through unsecured lines of credit). Further, the Debtors knew before they began construction that lenders were reluctant to finance such a unique home.

### Whether the Debtors Transferred Property

Finally, with respect to the third and fourth elements of § 727(a)(2)(A), the U.S. Trustee established that the purchases and payments in the year prior to bankruptcy were made by both of the Debtors -- Mr. Huber borrowed funds from creditors and made purchases with the knowledge and consent of his wife. The Debtors had discretion to use the funds they borrowed from their credit card issuers in any way they wished. Thus, the borrowed funds were property of the Debtors, and the Debtors transferred those funds within the meaning of §101(54(D)). *See, e.g., In re Adams*, 240 B.R. 807, 812 (Bankr. D. Me. 1999) (debtor's use of convenience checks to payoff a higher-interest credit card was a transfer of an interest of the debtor in property for purposes of §547 of the Bankruptcy Code). The net effect of these transfers was to increase the total amount of the Debtors' unsecured debt without any corresponding increase in non-exempt property available for distribution to creditors.

### CONCLUSION

Under the circumstances, the Court finds and concludes that the Debtors' course of conduct establishes their intent to hinder, delay or defraud their creditors as part of a scheme to obtain a mortgage-free home exempt from the claims of creditors. The

Debtors' careful manipulation of their credit cards created the illusion that they intended to pay their credit card debts and honor their credit agreements. In short, the Debtors orchestrated their credit cards so that they could finish building their home (thereby converting unsecured credit into an exempt asset) while maintaining a relatively comfortable lifestyle.

The Court further finds and concludes that the U.S. Trustee has established his objection under § 727(a)(2)(A) as to the American Express, Bank of America and Capital One accounts the Debtors opened and/or began using during 2004. The Debtors had liquidated all of their assets prior to the time they began using these accounts, the Debtors were either not paying or merely "juggling" their existing credit card debts, and neither of the Debtors was generating enough income to pay their monthly expenses. The Court, therefore, finds that the Debtors acted with actual intent to defraud American Express, Bank of America, and Capital One under the circumstances of this case.

No reasonable person could have believed that they could repay several hundred thousand dollars of credit card debt when they were generating so little income. The Court recognizes that objectively "hopeless insolvency" is not a substitute for a finding of subjective fraudulent intent. *See, e.g., In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998). In this case, however, the Debtors were aware of the minimum payments due to their creditors and knew that they did not have sufficient income to make those payments. Their course of conduct during the year prior to bankruptcy establishes an actual intent to defraud their creditors.

The Court will enter a judgment consistent with its ruling today. Items identified in the Court's ruling as findings of fact may also be construed to be conclusions of law,

and items identified as conclusions of law may also be construed to be findings of fact. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

Signed on 9/29/2006

*Brenda T. Rhoades* MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE